IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| JON HOAK, ANTHONY FANO, ALLAN QUICK, PATRICIA GIERING, and NANCY PARIN, on behalf of themselves and all those similarly situated, | Civil Action File |
| Plaintiffs, | No. 1:15-cv-03983-AT |
| v. | |
| PLAN ADMINISTRATOR OF THE PLANS OF NCR CORPORATION, | |
| Defendant. | |

**FOURTH AMENDED CLASS ACTION COMPLAINT**

SUMMARY OF CLAIMS

1.      This class action is brought on behalf of participants in defendant NCR Corporation's ("NCR") nonqualified retirement plans. NCR sponsored several non-qualified retirement plans that promised executives they would receive monthly or bi-weekly payments for the remainder of their lives when they retired from NCR. To protect the participants' retirement benefits, the NCR Board of Directors agreed to establish Trusts controlled by an independent Trustee if there was any change or potential change in control of NCR.

2.      In 1991, AT&T Corporation tendered an offer to purchase NCR. The NCR Board therefore created the Trusts and appointed a Trustee to protect participants' rights to their retirement benefits. Under new management, NCR later decided it was in the company's best interest to terminate the non-qualified plans, stop making annuity payments, and to make single lump sum payments to all participants in the non-qualified plans. To accomplish this goal, NCR amended the plans, secretly terminated the trusts, and replaced the plans' trustees with an NCR executive. NCR then terminated the plans and improperly calculated the amounts it owed to participants.

3.      Rather than pay participants the annuities, NCR discounted the payments by NCR's cost of borrowing. As a result, the lump sums NCR paid to participants were nowhere near the annuities promised in the plans.

4.      If this conduct is allowed to stand, employees who worked for years based on the contractual promises of a secure retirement and their former spouses will receive significantly less than what they were promised in the plans.

5.      As set forth below, the Court should:

(a) Certify this case as a class action under Fed. R. Civ. P. 23(b)(1) and (b)(2);

(b) Declare that NCR breached its agreements with plaintiffs by terminating the trusts and eliminating the trustee as the final arbiter of claims for benefits;

(c) Declare that NCR breached its agreements with plaintiffs by terminating the plans and paying lump sums that did not deliver to them the annuities they were promised in the plans;

(d) Declare that NCR's use of a flat 5% discount rate to discount the value of participants' and spouses' benefits was contrary to the plans;

(e) Declare that the plans required NCR to pay participants and spouses the accrued benefits they were promised under the plans, either in the form of replacement annuities or amounts sufficient to purchase replacement annuities, such as those derived using PBGC discount rates;

(f) Declare that, if the plans allowed NCR to convert the promised annuities lump sums, NCR could only discount by the time value of money, such as by using the applicable discount rates under § 417(e) of the IRS Code or such other rate(s) as the Court finds appropriate;

(g) Order NCR to pay participants, their eligible spouses and beneficiaries additional benefits reflecting the difference between what NCR has already paid and what they are required to pay under the Court's declarations; and

(h) Order NCR to pay plaintiff's attorneys' fees and costs under the terms of the plans, or such other legal basis as the Court deems appropriate.

## FACTUAL ALLEGATIONS

### A.    JURISDICTION AND VENUE

6.    Defendant NCR Corporation is a Fortune 500 multi-national company. Its world headquarters is currently at 3097 Satellite Blvd., Duluth, Georgia 30096.

7.    Defendant Andrea Ledford is Senior Vice President and Chief Human Resources Officer of NCR Corporation. On October 23, 2012, the Compensation and Human Resources Committee of the Board of Directors of NCR Corporation delegated its authority to amend the plans to her. She is a resident of New York, New York.

8.    Defendant Compensation and Human Resources Committee of the Board of Directors of NCR Corporation generally serves as the Plan Administrator for all of NCR's retirement Plans. It is located at 3097 Satellite

Blvd., Duluth, Georgia 30096. The Committee is composed of Linda Fayne Levinson (Chair), Edward P. Boykin, Gary J. Daichendt and Richard T. (Mick) McGuire.

9.      Plaintiff Anthony Fano is a participant in the NCR Senior Executive Retirement, Death and Disability Plan. He is a resident of Florida.

10.     Plaintiff Jon Hoak is a participant in the Retirement Plan for Officers of NCR, the NCR Nonqualified Excess Plan, the NCR Mid-Career Hire Supplemental Pension Plan, and the NCR Supplemental Pension Plan for AT&T Transfers. He is a resident of California.

11.     Plaintiff Allan Quick is a participant in the NCR Senior Executive Retirement, Death and Disability Plan. He is a resident of South Carolina.

12.     Plaintiff Patricia Giering is the former spouse of John Giering, who was, during their marriage, a participant in the NCR Senior Executive Retirement, Death and Disability Plan ("SERP"). John Giering retired from NCR and began receiving benefits under the SERP in 1998. At that time, he was still married to Patricia Giering, whose spousal benefits were then fully vested. Patricia and John Giering divorced in 2002.

13.     Plaintiff Nancy Parin is the former spouse of plaintiff Allan Quick. She was married to Allan Quick when he retired from NCR and began

receiving payments under the NCR Senior Executive Retirement, Death and Disability Plan, on February 1, 1995.

14. The plans are "employee pension benefit plans" and plaintiffs' claims "relate to" a "plan under ERISA." 29 U.S.C. §§ 1001 and 1002. Consequently, this Court has federal question jurisdiction over the claims asserted herein under 29 U.S.C. § 1132(e). In addition, this Court has subject matter jurisdiction pursuant to the general jurisdictional statute of "civil actions arising under the . . . laws . . . of the United States." 28 U.S.C. § 1331.

15. Pursuant to 29 U.S.C. § 1132(e), venue for this action is proper in the Northern District of Georgia because such action may be brought in the district where the plan is administered, where the breach took place, or where a defendant resides or may be found.

16. Venue and jurisdiction are also proper under the terms of the plans, which were amended to require any claim brought in connection with the plans to be filed in the U.S. District Court for the Northern District of Georgia.

**B.   THE PLANS**

17. NCR sponsored an IRS qualified retirement plan ("the NCR Pension Plan") and several nonqualified, so-called "top hat" retirement plans: the NCR Senior Executive Retirement, Death and Disability Plan ("Senior

Executive Plan"); the Retirement Plan for Officers of NCR ("Plan for Officers"); the NCR Nonqualified Excess Plan ("Excess Plan"); the NCR Mid-Career Hire Supplemental Pension Plan ("Mid-Career Plan"); the NCR Supplemental Pension Plan for AT&T Transfers ("AT&T Transfer Plan"); and the NCR Officer Plan ("Officer Plan") – collectively referred to as "the nonqualified plans."

18.    The nonqualified plans are "employee pension benefit plans" under ERISA § 3(2), 29 U.S.C. § 1002(2); but they are "nonqualified" under IRS Code § 401(a), 26 U.S.C. § 401(a)(2), in that employers are not entitled to a special tax deduction for the amounts paid to the participants.

19.    The nonqualified plans, working in tandem with each other and the qualified NCR Pension Plan, promised corporate officers, senior executives and other key personnel that when they retired from NCR, they would receive retirement annuities for the remainder of their natural lives, paid bi-weekly or monthly, based on their compensation and years of service, and without regard to the annual benefit limitations imposed on IRS qualified plans.

20.    NCR promised the benefits in the nonqualified plans to attract and retain executives of superior ability, industry and loyalty.

21.     The nonqualified plans, like the NCR Pension Plan, promised participants that if they pre-decease the persons to whom they are married when they began receiving retirement benefits, those spouses would be entitled to receive a portion of the participants' annuities for the remainder of the spouses' natural lives (so-called "joint and survivor annuities"). *See* Plan for Officers, Art. I, Doc 34-1 at 19, 40, 63[1] ("'Spouse' means the spouse of a Participant who was legally married to the Participant on the date payment of the Participant's benefits commence hereunder."); Senior Executive Plan, Art. I, Doc 34-2 at 22, 40 ("'Eligible Spouse' means the spouse to whom the Participant is married on the date the Participant's benefit payments under the Plan commence."); NCR Pension Plan, Art. V, § 5.1(a), Doc 34-3 at 49 (requiring joint and survivor annuity to be paid to person to whom participant is married "on the date his benefit payments commence").

22.     An essential feature and purpose of the nonqualified plans is to defer taxation on participants' and beneficiaries' retirement income until the money is paid, in bi-weekly or monthly payments, after retirement, when participants are likely to be in a lower tax bracket.

---

[1] References to the page numbers of documents previously filed with the Court's ECF system are to the page numbers assigned by the ECF system, not the internal pagination of the documents.

23.    To the extent that NCR was allowed to pay participants their pensions by converting their annuities to a single lump sum that was actuarially equivalent, the nonqualified plans required NCR to determine the "actuarial equival[ence]" of such lump sums by reference to the actuarial assumptions in the qualified NCR Pension Plan. *See* Plan for Officers, Art. VII, §§ (2)(b) and (3), Doc 34-1 at 44, 45, 69 (requiring "actuarial equival[ence]" to be "determined using the actuarial assumptions of the [NCR] Pension Plan"); Excess Plan, Art. IV, §§ 4.1(b)(ii) and 4.2, Doc 34-5 at 18, 19, 33, 34 (same; and also requiring that benefits under the plan "shall be paid at the same time and in the same form as the [ ] benefit under the [NCR] Pension Plan"); Mid-Career Plan, Art. IV, §§ 4.1(b)(ii) and 4.2, Doc 34-4 at 17, 32, 33 (same); Officer Plan, Art. IV, §§ 4.1(b) and 4.2, Doc 34-7 at 6 (same); AT&T Transfer Plan, Art. IV, §§ 4.1(b)(ii) and 4.2, Doc 34-6 at 7 (same). *See also* Administrative Rules for the NCR Plans, § 10, Doc 34-8 at 4-5. But these provisions were added to the plans only in 2008, after all the plans were frozen, all participants had ceased accruing benefits, and most of the participants had already retired and begun receiving their annuity benefits.

24.    The NCR Pension Plan required actuarial equivalence between forms of payments, including lump sums, to be determined using the IRS § 417(e) interest rates and mortality tables. *See* NCR Pension Plan, Doc 34-3 at

11, 33, 49, Art. I, § 1.2 ("conversions between life annuities and lump sum benefits will be determined using the PensionPlus Assumptions in Section 3.4(b)"), Art. III, § 3.4(b) (defining the actuarial assumptions to be used as "the Applicable Interest Rate" and "Applicable Mortality Table" "as defined in Section 417(e) of the Code"), Art. V, § 5.1(a) (requiring actuarial equivalence of joint and survivor annuity to be calculated using § 417(e) assumptions).

25.    The plans prohibited amending or terminating the plans if such actions would "adversely affect" any participant's or spouse's "accrued benefits" or other "benefit" under the plans. *See* Plan for Officers, Doc 34-1 at 11, 23, 47, 71 ("no such action shall adversely affect any Participant's, former Participant's or Spouse's accrued benefits prior to such action"); Senior Executive Plan, Art. XII, Doc 34-2 at 12, 29, 49 (same); Mid-Career Plan, Art. VII, § 7.1, Doc 34-4 at 5, 18, 35 ("no such action shall adversely affect the right of any Participant (or spouse) to a benefit to which he or she has become entitled pursuant to this Plan"); AT&T Transfer Plan, Art. VII, § 7.1, Doc 34-6 at 8 (same); Excess Plan, Art. VII, § 7.1, Doc 34-5 at 4, 20, 36 ("no such action shall adversely affect the right of any Participant (or Beneficiary) to a benefit to which he or she has become entitled pursuant to this Plan"); Officer Plan, Art. VII, § 7.1, Doc 34-7 at 7 ("no such action shall adversely affect the

right of any Participant or surviving spouse to a benefit to which he or she has become entitled pursuant to this Plan").

26. The plans, without any limitations on venue, originally specified that Ohio law would govern disputes over the agreement. *See* Senior Executive Plan, Art. XIV, § 2; Plan for Officers, Art. XII, § 2; Excess Plan, Art. VIII, § 8.1; Mid-Career Plan, Art. VIII, § 8.1; AT&T Transfer Plan, Art. VIII, § 8.1; Officer Plan, Art. IX, § 8.1.

27. The plaintiffs and all proposed class members fulfilled all their obligations to NCR and have satisfied all requirements for them to be entitled to the retirement income promised under the qualified and nonqualified plans.

**D.    SPECIAL PROTECTIONS IN THE PLAN FOR OFFICERS AND SENIOR EXECUTIVE PLAN**

28. The Plan for Officers and Senior Executive Plan provided special protections to participants in the event of a "change in control" of NCR. *See* Senior Executive Plan, Art. XIII, Doc 34-2 at 12-13; Plan for Officers, Doc 34-1 at 12, 23, 47.

29. If there was a potential or actual change in control, the Plan for Officers and Senior Executive Plan required the Board of Directors, unless it determined otherwise in writing, to "cause[ ] the creation and funding of a

trust (the "Trust") to meet the obligations under the Plan" and appoint a Trustee to control those assets. Senior Executive Plan, Art. XIII, § 1, Doc 34-2 at 12-13; Plan for Officers, Doc 34-1 at 12, 25-6.

30.    The Plans gave final control over benefit claims to the Trustee. Senior Executive Plan, Art. XIII, § 1, Art. XIV, § 3, Doc 34-2 at 12-13, 20; Plan for Officers, Doc 34-1 at 12, 25-6, 53-4.

31.    NCR agreed that the Trustee, not NCR, would make final and binding determinations on any benefit appeals; that the Trustee would make a *de novo* review of claims, with NCR bearing the burden to justify any denial of benefits. *See* Plan for Officers, Doc 34-1 at 25-6, 53-4 ("The burden of proof shall be upon NCR to establish its basis for the denial. ... The Trustee shall make a de novo review. … Its determination shall be final, conclusive and binding upon the Company and the Claimant."); Ex. B, Senior Executive Plan, Doc 34-2 at 20, 30 (same).

32.    NCR also agreed to pay "all legal fees and expenses reasonably incurred by the Participant," unless "a court of competent jurisdiction shall have finally determined by a final judgment, order or decree (which is not appealable or the time for appeal therefrom having expired and no appeal having been perfected) that such action was not in good faith." Senior

Executive Plan, Doc 34-2 at 20, 30; Ex. A, Plan for Officers, Doc 34-1 at at 25-6, 53-4 (same).

33.    In short, the Plan for Officers and Senior Executive Plan provided that after a change in control, NCR would: (a) place the funds to pay the participants' benefits in a Trust, (b) appoint a Trustee to independently hold and manage Trust assets, (c) create an open and fair process for determining appeals, (d) give the Trustee power to make final decisions on claims, (e) pay participants' reasonable attorneys' fees and costs unless a court determines their claims to be made in bad faith, and (f) provide participants open access to state and federal courts, with the only proviso being that the laws of Ohio, where NCR was then headquartered, would govern.

34.    In November 1991, after AT&T tendered an offer for NCR, NCR established trusts for the purpose of securing benefits under the Plan for Officers and Senior Executive Plan, and notified participants of the same.

35.    The Trustee for the Trusts was Bank One Dayton, NA, located in Kettering Tower, Dayton, OH 45401, which has since been acquired by JPMorgan Chase Bank, N.A., which still operates out of the Kettering Tower in Dayton.

36.    AT&T then acquired NCR.

**E.    NCR REPLACES THE BOARD OF DIRECTORS WITH COMPANY EXECUTIVES AND THEN SECRETLY ELIMINATES THE TRUSTS AND TRUSTEE**

37.    The 2008 amended and restated Plan for Officers and Senior Executive Plan both eliminate the requirement that the Committee establish and fund a Trust.

38.    On October 23, 2012, the Compensation Committee delegated the authority to amend the Plans to the Senior Vice President and Chief Human Resources Officer, Andrea Ledford, who was given "authority to authorize, approve, adopt and execute any amendment to [the Plan] with respect to its provisions for Plan administration, benefit claims or appeals and to take any and all such other action necessary or appropriate in connection with such amendment." *See* NCR Corporation's Board of Directors Delegation of Authority, Doc 34-9.

39.    On October 23, 2012, NCR amended the 2008 Restatements for the Plan for Officers and the Senior Executive Plan to amend the definition the Compensation Committee and add a definition for "Plan Administrator."

40.    The new definition of "Committee" is "the Compensation and Human Resource Committee of the Board of Directors," unless there is no such committee, in which case the Committee is the Board of Directors. *See*

First Amendments to the 2008 Senior Executive Plan, Doc 34-2 at 35-6; Plan for Officers, Doc 34-1 at 56-7.

41.    "Plan Administrator" was defined to be the "the Compensation and Human Resources Committee of the Board of Directors," unless NCR delegated that authority to someone else. *See* Doc 34-2 at 35-6; Doc 34-1 at 56-7.

42.    The Compensation Committee delegated to Andrea Ledford, Senior Vice President and Chief Human Resources Officer of NCR Corporation, its "authority to authorize, approve, adopt and execute any amendment to [the Plan] with respect to its provisions for Plan administration, benefit claims or appeals and to take any and all such other action necessary or appropriate in connection with such amendment." Doc 34-9.

43.    The Committee deleted Article III of the 2008 Restated Plans in their entirety and replaced Article III with provisions giving the Plan Administrator (i.e., the Compensation Committee) power to (among other things): (a) rule on all claims *and appeals* for benefits; (b) determine whether reimbursable attorneys' fees and costs under Article XIV were reasonably conferred; and (c) "delegate its authority to amend the Plan in whole or part." Doc 34-2 at 35-6; Doc 34-1 at 56-7.

44.    The Plan Administrator, however, was prohibited from and did not have "power" to "add to, subtract from or modify any of the terms of the Plan, or to change or add to any benefits provided by the Plan, or to waive or fail to apply any requirements of eligibility to receive a benefit under the Plan." Doc 34-1 at 58; Doc 34-2 at 37; Doc 34-4 at 24; Doc 34-5 at 24. .

45.    The nonqualified plans were also amended so that "[a]ll rules and decisions of the Plan Administrator shall be uniformly and consistently applied to all Participants in similar circumstances." Doc 34-1 at 58; Doc 34-2 at 37; Doc 34-4 at 25-6; Doc 34-5 at 24-5.

46.    NCR amended all the nonqualified plans to make "all retirement plans of NCR [ ] subject to uniform provisions and procedures for plan administration, benefit claims and appeals." Doc 34-1 at 56; Doc 34-2 at 35; Doc 34-4 at 23; Doc 34-5 at 23.

47.    NCR terminated the Trusts without notice to the beneficiaries of the Trusts, either by NCR or the Trustee.

48.    As a result of the First Amendment to the 2008 Senior Executive Plan and Plan for Officers, the Trustee was eliminated, along with its power to rule on appeals of NCR's benefit determinations.

49.     The defendants' termination of the Trusts and removal of the Trustee breached the agreements and was undertaken with malice toward plaintiffs and proposed class members.

50.     The Compensation Committee also inserted a venue selection clause, which prohibits participants from filing suit in Ohio, where the Company's headquarters existed for decades, and required any claim brought in connection with the Plan to be filed in the U.S. District Court for the Northern District of Georgia.

51.     NCR thereafter issued 2013 restatements of the all the nonqualified plans to reflect the amendments.

**F.     NCR TERMINATES ALL THE NONQUALIFIED PLANS.**

52.     On December 31, 2010, according to NCR's SEC filings, NCR had only $11 million in debt. On December 31, 2011, according to NCR's SEC filings, NCR's debt had grown to $853 million. By December 31, 2012, NCR's debt had ballooned to $1.963 billion.

53.     In December 2012, in part because of NCR's dramatic growth in debt, Moody's downgraded NCR's corporate family and probability of default ratings to Ba2 from Ba1.

54.    On February 18, 2013, Andrea Ledford, the newly created Plan Administrator, held a meeting to discuss terminating all NCR non-qualified Plans.

55.    At the February 18, 2013 meeting, Rosina Barker (outside counsel from the law firm of Ivins, Phillips & Barker) advised NCR that it could terminate the nonqualified plans "provided that the termination does not adversely affect a participant's or beneficiary's benefit entitlement under the Plan, or violate certain provisions of [IRC] section 409A." She also opined that "deleting the annuity benefit payment and replacing it with a lump sum payment is reasonably construed as providing the full benefit entitlement under the Plans *provided the lump sum payment is the actuarial equivalent of the annuity benefit.*" Minutes, Feb. 18, 2013 Doc 34-10 at 3 (emphasis added).

56.    At that meeting, Ms. Barker discussed interest rates that could be applied to discount the value of participants' benefits to present value; but the minutes do not reflect the rates she suggested.

57.    The Plan Administrator determined that a flat 5% discount rate was "reasonable" because it "produces a reasonable approximation or the monetary value of the [pension] obligation" based on the fact that 5% is the "current rate of an unsecured obligation of the Company." Doc 34-10 at 3.

58.    On February 20, 2013, the Committee "voted unanimously that the CHRC's resolution to terminate the Plans by settling all benefits as a lump sum payment would not 'adversely affect' any accrued benefit if the lump sum is actuarially equivalent to the annuity benefit, using reasonable actuarial assumptions." Minutes, Feb. 20, 2013, Doc 34-11 at 3.

59.    The Committee then "voted unanimously that the 5% discount rate is reasonable for purposes of valuing the annuity benefits payable under the Plans." Doc 34-11 at 4.

60.    On February 25, 2013, the Committee voted to terminate the Plans and use a 5% discount rate to reduce the value of participants' annuities to present value.

61.    The Plan Administrator purported to justify use of a 5% discount rate based on NCR's cost of borrowing at the time. *See* Project Connor: Plan Administrator Assumptions and Decisions Regarding Calculation of Lump Sums, Doc 34-12.

62.    On March 15, 2013, NCR wrote participants informing them that the Plans had been terminated and telling them the lump sum amounts they would receive in June 2013.

G.     PLAINTIFFS EXHAUSTED THEIR ADMINISTRATIVE REMEDIES.

63.     Plaintiffs Hoak, Fano, Quick, and numerous other participants filed timely administrative claims with the Plan Administrator objecting to the termination of the Trusts, the termination of their annuities, the inadequacy of the lump sums, the interpretation of the terms "Spouse" and "Eligible Spouse," and other issues.

64.     NCR provided no notice to Patricia Giering or Nancy Parin that they may be eligible for a spousal benefit.

65.     John Giering filed an administrative claim challenging the Plan Administrator's decision that Patricia Giering was not eligible for a spousal benefit. *See* Doc 23-2.

66.     Allan Quick filed an administrative claim stating that Nancy Quick (now Nancy Parin) was his Eligible Spouse, and challenging NCR's decision not to pay a spousal benefit.

67.     The Plan Administrator denied all plaintiffs' and John Giering's administrative claims in their entirety, and informed participants that they could appeal the ruling to the very same Plan Administrator who had denied their claims.

68.     Plaintiffs and John Giering filed timely administrative appeals.

69.     In their appeals, plaintiffs and Giering requested documents regarding the elimination of the Trusts and Trustees (among other things), but the Plan Administrator refused to provide any documents regarding the Trusts or Trustee.

70.     The Plan Administrator denied plaintiffs' and Giering's appeals in their entirety.

71.     Plaintiffs have exhausted all required administrative remedies.

72.     Any further administrative proceedings would be futile.

73.     Nancy Parin should not be required to file an additional administrative claim because NCR has eliminated the Trustee to whom she had a right to appeal.

74.     As a result of the defendants' conduct, plaintiffs Hoak, Fano, Quick, Giering, Parin and proposed class members have received significantly less than the pensions they were promised.

75.     They now appeal to this Court to rectify NCR's breach of its contracts and violations of ERISA.

H.     CLASS ALLEGATIONS

76.     The named plaintiffs bring this action on their own behalf, and on behalf of a similarly situated class of persons under Fed. R. Civ. P. 23.

77.     The named Plaintiffs seek to represent a class of:

> All participants, former participants and spouses or eligible spouses, as defined in the NCR Senior Executive Retirement, Death and Disability Plan, the Retirement Plan for Officers of NCR; the NCR Nonqualified Excess Plan, the NCR Mid-Career Hire Supplemental Pension Plan, or the NCR Supplemental Pension Plan for AT&T Transfers.

78.    There are more than 100 participants and spouses eligible for benefits under the terminated NCR nonqualified plans. The individuals in the Class are therefore too numerous for joinder to be practicable.

79.    There are several questions of law and fact common to the Class. These common questions predominate over any questions affecting only individuals. Among these common, predominating questions are:

    a.    Whether NCR acted improperly by terminating the Trusts and removing the Trustee's responsibility for determining final administrative appeals;

    b.    Whether NCR's reliance on its cost of borrowing during the time-frame to justify the flat 5% discount rate was allowed under the plans;

    c.    Whether NCR's use of flat 5% interest rate to discount all class members' annuities to present value was consistent with the plans;

d.   Whether NCR's use of a flat 5% discount rate violated uniform plan provisions prohibiting amendments that adversely affect or reduce the participants' benefits under the plans; and

e.   Whether NCR's use of a flat 5% discount rate provided class members with the "actuarial equivalent" of the accrued benefits, which were life annuities, they were promised under the plans.

80.   Common questions of law and fact predominate in that:

a.   All class members were participants in NCR nonqualified plans;

b.   All their plans were terminated on the same day, by the same resolution;

c.   All participants received lump sums that were improperly calculated using the same 5% discount rate; and

d.   All class members' claims are based on the same Plan provisions.

81.   The named Plaintiffs' claims are typical of those of the putative class in that their benefits were calculated using the same discount rate and mortality tables as every other participant.

82.    The named Plaintiffs will fairly and adequately represent the interests of the Class.

83.    The named Plaintiffs have retained skilled and experienced counsel to represent them in class litigation.

84.    A class action is superior to other available methods for the fair and efficient adjudication of the controversy because many class members will not be compensated for their injuries in the absence of a class action.

85.    In addition, individual litigation would result in considerable delay and expense to all parties and unnecessarily burden the court system with numerous, essentially identical claims. By contrast, a class action presents fewer management difficulties and provides the benefits of unitary adjudication, economies of scale and comprehensive supervision by a single court.

86.    Prosecuting the claims of participants and Eligible Spouses through many separate, individual lawsuits would create a risk of inconsistent or varying adjudications that would establish incompatible standards of conduct for the Plans, which all require participants to be treated the same.

87.     Defendants have acted or refused to act on grounds generally applicable to the Class, making final injunctive and declaratory relief appropriate.

88.     Consequently, the Court should certify the proposed class under Fed. R. Civ. P. 23(b)(1) and (b)(2).

## COUNT I:  IMPROPER REMOVAL OF THE TRUSTEE AND ELIMINATION OF THE TRUSTS

89.     Plaintiffs incorporate by reference the preceding paragraphs into this count.

90.     The Plan for Officers and the Senior Executive Plan required NCR to create and fund trusts, overseen by a trustee, who would protect participants and beneficiaries, and make final determinations of benefit claims, under a *de novo* review, with NCR bearing the burden of proof on all claim denials.

91.     NCR breached its agreements with plaintiffs by eliminating the trusts and trustee, and then arrogating to itself the power to make all decisions regarding benefits.

## COUNT II:  USE OF AN IMPROPER INTEREST RATE TO REDUCE PARTICIPANTS' AND SPOUSES' ANNUITIES

92.     Plaintiffs incorporate by reference the preceding paragraphs into this count.

93.    The nonqualified plans required NCR to deliver to participants their full accrued benefits, which were exclusively in the form of life annuities. To the extent the plans allowed payments of "actuarially equivalent" lump sums by virtue of provisions that were added in 2008, they required NCR to determine the "actuarial equivalence" of any payment form, including lump sums, by reference to the actuarial assumptions provided for under the NCR Pension Plan.

94.    The NCR Pension Plan required actuarial equivalence between forms of payments, including lump sums, to be determined using the IRS § 417(e) interest rates and mortality tables.

95.    The applicable § 417(e) segment rates at the time of plan termination were: 1% for the first 5 years of payments, 3.73% for the next 15 years of payments, and 4.89% thereafter.

96.    Defendants did not use the applicable § 417(e) segment rates.

97.    Rather than deliver the full accrued benefit, as the plans required, or select a discount rate designed to produce lump sums that allowed participants to replace the full accrued benefit, defendants elected to pay participants only what they termed the "economic value" of the pensions, which they calculated by reference to the high rate of interest NCR was paying as a result of its ballooning debt and credit downgrade.

98.    By selecting the 5% discount rate, NCR not only discounted its obligations to plaintiffs by NCR's risk of defaulting on its promises, NCR also charged participants a premium.

99.    As a result of terminating the nonqualified plans and using a 5% discount rate, NCR was able to announce a $13 million curtailment gain in the first quarter of 2013.

100.    Instead of delivering the promised annuities or using a discount rate designed to provide participants with lump sum sufficient to replace their annuities, defendants used a flat 5% discount rate, which violated the plans and "adversely affected" participants' and spouses' accrued benefits under the plans.

**WHEREFORE**, plaintiffs pray for the following relief:

(i)    Certify this case as a class action under Fed. R. Civ. P. 23(b)(1) and (b)(2), appoint the named plaintiffs as class representatives and their attorneys as class counsel;

(ii)    Declare that NCR breached its agreements with plaintiffs by terminating the trusts and eliminating the trustee as the final arbiter of claims for benefits;

(iii) Declare that NCR breached its agreements with plaintiffs by terminating the plans and paying lump sums that did not deliver to them the annuities they were promised in the plans;

(iv) Declare that NCR's use of a 5% discount rate to discount the value of participants' and spouses' benefits was contrary to the plans;

(v) Declare that the plans required NCR to pay participants and spouses the accrued benefits they were promised under the plans, either in the form of replacement annuities or amounts sufficient to purchase replacement annuities, such as those derived from PBGC discount rates;

(vi) Declare that, if the plans allowed NCR to convert the promised annuities to lump sums, NCR could only discount by the time value of money, such as by using the applicable § 417(e) rates, or such other rate(s) as the Court finds appropriate;

(vii) Order NCR to pay participants, their eligible spouses and beneficiaries a lump sum reflecting the difference between what NCR has already paid and what they are required to pay under the Court's declarations;

(viii) Order NCR to pay pre-judgment and post-judgment interest;

(ix)    Order NCR to pay reasonable attorneys' fees and costs pursuant

to the plans and/or award fees pursuant to the common benefit

doctrine, or any other applicable law; and

(x)    Order such other relief as this Court finds appropriate.

Respectfully submitted this 20th day of December, 2021.

/s/ Timothy S. Rigsbee
Timothy S. Rigsbee
Georgia Bar No. 605579
BONDURANT MIXSON & ELMORE, LLP
3900 One Atlantic Center
1201 West Peachtree Street, NW
Atlanta, GA 30309
P:  (404) 881-4100
F:  (404) 881-4111
rigsbee@bmelaw.com

Michael E. Klenov
Garrett R. Broshuis
KOREIN TILLERY, LLC
505 North 7th Street, Suite 3600
St. Louis, MO 63101
P:  (314) 241-4844
F:  (314) 241-3525
mklenov@koreintillery.com
gbroshuis@koreintillery.com

*Attorneys for Plaintiffs*

## CERTIFICATE OF COMPLIANCE

Pursuant to Local Rule 7.1(D), I hereby certify that this document complies with the font and point selections set forth in Local Rule 5.1. This document was prepared in Century Schoolbook 13 point font.

This 20th day of December, 2021.


/s/ Timothy S. Rigsbee
Timothy S. Rigsbee